IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNICREDIT BANK AG, NEW YORK
BRANCH, f/k/a/ BAYERISCHE HYPO-UND
VEREINSBANK AG, as agent for
THE BANK OF NEW YORK MELLON,

          Plaintiff,

v.                                  Case No. 12-2249-JTM

DEBORAH R. EASTMAN, INC., *et al.*,

          Defendants.

MEMORANDUM AND ORDER

The present matter comes to the court on the defendants' Motion to Dismiss (Dkt. 16). For the following reasons, the court grants in part and denies in part the defendants' motion.

**I. Factual Background**

Plaintiff UniCredit brings this action on a defaulted loan, as agent for The Bank of New York Mellon ("Mellon"), which was the indenture trustee under the Indentures described below. Mellon is the party in interest under the loan and the related commercial loan agreement and other relevant loan documents. Deborah R. Eastman, Inc. (the "Eastman Agency"), is the obligor of the loan. Deborah R. Eastman, in her personal capacity, is the guarantor of the loan received by the Eastman Agency. This action arises from defendants' defaults under the loan documents and related guaranty, which allegedly caused damage to the plaintiff.

The plaintiff and the defendants are connected by a securitization, also known as an asset-backed security arrangement. The chain of transactions linking the plaintiff with the defendants is lengthy and complicated because the parties are on opposite ends of the chain. A short explanation of what a securitization is may be helpful.[1]

A securitization involves two steps, which may occur simultaneously or separately. Initially, an entity that creates loans in its normal course of business (the "Originator") sells its loans to a special purpose entity ("SPE"). The sale will be performed in a manner that qualifies as a "true sale," as opposed to a secured transaction, which is done in part to protect the loans and their streams of revenue from creditors of the Originator. Second, the SPE will issue and sell debt securities, referred to as Notes, to investors. The Notes are secured by the loans the SPE bought from the Originator. Additionally, the SPE will satisfy its obligations on the Notes using the proceeds of the loans it bought from the Originator. When the securitization is "closed," funds flow from the purchasers of the Notes (the investors) to the SPE, and then from the SPE to the Originator.

This case begins with Brooke Credit Corp. ("BCC"), an entity located in Kansas that sponsored a number of securitizations, including the one at issue here. BCC was in the business of underwriting and making loans to duly licensed insurance agents, including the Eastman Agency. On March 28, 2003, Eastman, in her personal capacity, executed and delivered her Personal Guaranty to BCC providing that she would

---

[1]The court's explanation of securitizations borrows heavily from Timothy C. Leixner, *Securitization of Financial Assets*, http://mx.nthu.edu.tw/~chclin/Class/Securitization.htm, (Sept. 1, 1999).

2

"absolutely and unconditionally" guarantee the indebtedness of the Eastman Agency. On September 30, 2003, BCC and the Eastman Agency executed an Agreement for Advancement of Loan (the "Eastman Loan Agreement") establishing the terms of their lender/borrower relationship. Pursuant to the Eastman Loan Agreement, the Eastman Agency executed a Commercial Security Agreement ("Eastman Security Agreement") granting BCC a security interest and lien in all assets used to operate the Eastman Agency. BCC perfected this security interest on October 20, 2003, by filing a U.C.C. financing statement. On February 28, 2006, BCC lent $745,459.52 to the Eastman Agency through Loan No. 5084, which referred to and incorporated the terms of the Eastman Loan Agreement and Security Agreement. The Eastman Agency used the loan proceeds to purchase insurance agency assets and for other agency-related purposes.

To proceed with its securitizations, BCC created SPEs to which it sold various loans. In exchange, the SPEs would pay cash they had raised by issuing Notes. The specific securitization at issue here was formed through BCC's creations of the SPE Brooke Securitization Company 2006-1, LLC ("BSC 2006-1"). BCC sold several loans in an asset pool to BSC 2006-1 by executing the Sale and Servicing Agreement. The asset pool included Loan No. 5084 from BCC to the Eastman Agency.

BCC sold the loans in exchange for cash raised by BSC 2006-1 through its issuance of Notes. On July 1, 2006, BSC 2006-1 issued $52,346,089 in Notes pursuant to

the Indenture.[2] In the Indenture, BSC 2006-1 was the issuer and Mellon was the trustee. In exchange for the Notes issued in the Indenture, BSC 2006-1 assigned the collateral asset pool to Mellon, as security on behalf of the investors. This security took the form of a first priority perfected security interest in, and lien upon, virtually all of BSC 2006-1's assets, including its right, title and interest in the asset pool acquired from BCC, the security for the loans in the asset pool, the guaranties of the loans in the asset pool, and the proceeds of the foregoing. Plaintiff UniCredit became a Noteholder, acquiring 100% of the Notes issued in the Indenture.

In 2008, BSC 2006-1 defaulted on its obligations under the Notes by failing to remit payments on those Notes. On October 9, 2008, UniCredit sent a letter notifying Mellon of the default and instructing it to demand accelerated payment of the remainder due on the Notes and to take all permitted action against the collateral securing the Notes. Pursuant to a letter agreement and Power of Attorney dated October 22, 2008, Mellon designated UniCredit as its agent to take all actions with respect to the rights and remedies permitted under the Indenture, including collection on the collateral.

On October 28, 2008, several Brooke entities filed for Chapter 11 bankruptcy in U.S. District Court for the District of Kansas. The court entered an order permitting Mellon and UniCredit to enforce their rights and remedies including the right to foreclose on the collateral assigned to Mellon in the Indenture.

---

[2]An indenture is a contract reflecting a debt or purchase obligation between an issuer and a trustee, the latter of which represents the interests of the investors, i.e., the parties who will acquire the debt instruments.

Additionally, the Eastman Agency allegedly failed to remit payment when due, defaulting on Loan No. 5084. Eastman has also refused and failed to make payments due under her Personal Guaranty.

UniCredit—on behalf of Mellon—filed suit in this court, seeking to collect on Loan No. 5084 through the rights it has acquired through the chain of transactions in this securitization and subsequent defaults by the BSC 2006-1, the Eastman Agency, and Eastman. UniCredit alleges the following causes of action: (I) Action on the Loan Against the Eastman Agency; (II) Action on the Guaranty Against Deborah R. Eastman; (III) Detinue and Collateral foreclosure Judgment Against the Eastman Agency; (IV) Quantum Meruit Against all Defendants; (V) Breach of Implied Covenant of good Faith and Fair Dealing Against all Defendants; (VI) Conversion Against all Defendants; and (VII) Account Notice/Declaratory Relief Against all Defendants.

Defendants have filed a Motion to Dismiss, arguing that (1) UniCredit has not proved a valid chain of title sufficient for standing, and (2) Unicredit has failed to state a claim in claims IV, V, and VI.

**II. Legal Standard**

A. Motion to Dismiss for Lack of Standing

Article III of the U.S. Constitution limits the exercise of the federal judicial power to cases and controversies. U.S. Const. art. III, § 2. The doctrine of standing serves to identify cases and controversies that are appropriate for exercise of judicial power. To satisfy Article III's standing requirements, a plaintiff must show: (1) it has suffered an

5

"injury in fact" that is concrete and particularized and actual or imminent; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. Inc.*, 528 U.S. 167, 180–81 (2000). A motion to dismiss for lack of standing implicates the court's subject matter jurisdiction and, therefore, is construed pursuant to Federal Rule of Civil Procedure 12(b)(1). *See New Mexicans for Bill Richardson v. Gonzales*, 64 F.3d 1495, 1498–99 (10th Cir. 1995).

Rule 12(b)(1) motions generally take one of two forms: (1) a facial attack on the sufficiency of the complaint's allegations as to subject matter jurisdiction; or (2) a challenge to the actual facts upon which subject matter jurisdiction is based. *Holt v. United States*, 46 F.3d 1000, 1002–03 (10th Cir. 1995) (citation omitted). A facial attack questions the sufficiency of the complaint, but a factual challenge contests the facts upon which the subject matter depends. *Id.* When considering a facial attack, the court "must accept the allegations of the complaint as true." *Id.* at 1003. However, when considering a factual challenge, the court "may not presume the truthfulness of the complaint's factual allegations." *Id.* When considering a factual challenge under Rule 12(b)(1), "[a] court has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts." *Id.* "In such instances, a court's references to evidence outside the pleadings does not convert the motion to a Rule 56 motion." *Id.* Generally, conversion of a Rule 12(b)(1) motion is not allowed unless the "jurisdictional question is intertwined with the merits of the case." *Wheeler v. Hurdman*, 825 F.2d 257, 259 (10th Cir. 1987).

B. Motion to Dismiss for Failure to State a Claim

Federal Rule of Civil Procedure 8(a)(2) provides that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." The complaint must give the defendant adequate notice of what the plaintiff's claim is and the grounds of that claim. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002).

"In reviewing a motion to dismiss, this court must look for plausibility in the complaint . . . . Under this standard, a complaint must include 'enough facts to state a claim to relief that is plausible on its face.' " *Corder v. Lewis Palmer Sch. Dist. No. 38*, 566 F.3d 1219, 1223–24 (10th Cir. 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (clarifying and affirming *Twombly*'s probability standard). Allegations that raise the specter of mere speculation are not enough. *Corder*, 566 F.3d at 1223–24. The court must assume that all allegations in the complaint are true. *Twombly*, 550 U.S. at 589. "The issue in resolving a motion such as this is 'not whether [the] plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims.' " *Bean v. Norman*, No. 008-2422, 2010 WL 420057, at *2 (D. Kan. Jan. 29, 2010) (quoting *Swierkiewicz*, 534 U.S. at 511).

**III. Conclusions of Law**

A. Motion to Dismiss Under FED. R. CIV. P. 12(b)(1)

The defendants make both facial and factual challenges to UniCredit's standing. First, defendants argue that UniCredit has pleaded an insufficient basis for standing as an assignee. Second, defendants dispute the factual allegations relied upon by UniCredit to establish standing. The court accepts allegations in the complaint as true when it considers defendants' facial challenge, but it may not presume the truthfulness of the complaint's factual allegations when considering the factual challenge. *See Holt*, 46 F.3d at 1003.

Further, the jurisdictional questions raised by the defendants' Motion to Dismiss are separate from the merits of UniCredit's claims. Defendant challenges the chain of title for establishing jurisdiction, and these issues are separate from the defendants' alleged breach of the loan agreement and guaranty—the central issue of UniCredit's claims. As a result, this court does not convert defendants' 12(b)(1) motion into a motion for summary judgment. *See Wheeler*, 825 F.2d at 259.

1. UniCredit's rights in Defendants' Loan

Defendants challenge UniCredit's basis for establishing standing as insufficient. This is defendants' facial challenge to UniCredit's standing, so the court must accept allegations in the complaint as true. *See Holt*, 46 F.3d at 1003. According to the complaint, UniCredit has constitutional standing because UniCredit has suffered an injury in fact in the form of monetary damages as a result of the defendants' defaults. Additionally, the chain of transactions alleged in the complaint establishes that (1) Mellon is an assignee of the defendants' loan agreement and guaranty and (2) Mellon has granted its Power of Attorney to UniCredit.

8

The Eastman Agency entered into a secured loan—Loan No. 5084—with BCC, which Eastman guaranteed. BCC then sold this loan and the rights associated with it in an asset pool to BSC 2006-1 via the Sale and Servicing Agreement. BSC 2006-1 issued Notes through the Indenture, and assigned to Mellon (as indenture trustee) a first priority perfected security interest in all of BSC 2006-1's assets, including the asset pool containing Loan No. 5084. When BSC 2006-1 defaulted on the Notes it had issued, Mellon designated UniCredit as its agent with Power of Attorney, granting it the power to collect on the collateral. After the defendants allegedly failed to remit payments on Loan No. 5084, UniCredit brought this action to enforce its rights in the loan.

Accepting all of these pleaded facts as true, the chain of assigned rights in the loan and power to enforce it establishes UniCredit's standing. The court finds that the facial challenge to UniCredit's standing fails. The defendants' remaining challenges to standing are factual challenges.

2. Specific Authority Granted by Sale and Servicing Agreement

Defendants argue that under Kansas law, an assignee under a loan can only receive the rights and powers explicitly granted to him or her citing *Tri-State Truck Ins., Ltd. v. First Nat'l Bank of Wamego*, No. 09-4158-SAC, 2001 WL 3349153, at *15 (D. Kan. Aug. 3, 2011). However, the assignment at issue in *Tri-State Truck Ins., Ltd.* was much different from the one at issue here. *Tri-State Truck Ins., Ltd.* involved a loan participation agreement rather than a securitization. *See* 2001 WL 3349153, at 2. As a result, the party seeking enforcement of the loan in *Tri-State Truck Ins., Ltd.* had no contractual relationship with the borrower, either directly or through assignment. In the

9

case at hand, the indenture trustee has statutory rights against the borrower as a secured creditor that were not at issue in *Tri-State Truck Ins., Ltd.*

Also, under the participation agreement in *Tri-State Truck Ins., Ltd.*, the original lender retained ownership of the loans and only assigned certain specific rights and administrative duties to the assignee. *Id.* at 15. The court concluded that because the original lender had not assigned its right and title to the loans and specifically retained the sole right to proceed directly against the borrower upon default, the assignment did not provide standing to the assignee. *Id.* In this case, the Sale and Servicing Agreement between BCC and BSC 2006-1 was much broader. It sold and transferred all of BCC's right, title and interest in the securitized loans and collateral backing them to BSC 2006-1. Thus, any questions the court had in *Tri-State Truck Ins., Ltd.* regarding the scope of rights assigned do not exist in this case. The court's inquiry into the scope of the specific assignment of rights in this case reveals that it was plenary.

3. Rights Granted by Indenture

Defendants argue that although Article 9 of the U.C.C. allows a secured party to enforce the obligations of an account debtor, this is merely a general guideline, and the parties are free to contractually structure the transaction and remedies as desired. Defendants argue that the Indenture specifically states the remedies available in the event of a breach, which supersedes the Article 9 remedies.

The grant of the Indenture includes Mellon's power "to bring Proceedings in the name of the Granting party (BSC 2006-1) or otherwise and generally to do and receive anything that the Granting party is or may be entitled to do or receive thereunder or

10

with respect thereto." Thus, the Indenture broadly granted Mellon the same rights in the loan documents that BSC 2006-1 had, including the right to file suit to enforce its interest.

The defendants' remaining arguments regarding the scope of rights and remedies granted to UniCredit by the Bankruptcy Order and Power of Attorney presume that UniCredit did not have the explicit authority to pursue the defendants. These arguments are not persuasive because of the Indenture's broad grant of power, which the Bankruptcy Order and Power of Attorney implicitly rely upon.

4. UniCredit Is an Entity Entitled to Enforce the Loan

Defendants also challenge UniCredit's standing by arguing that UniCredit is neither a holder, nor a holder in due course. However, this court need not consider whether UniCredit became a holder or holder in due course. When a negotiable instrument represents the obligation to be enforced, the issue of whether the plaintiff has a legal right to enforce the obligation is determined by the Commercial Code. *See In re Jackson*, 451 B.R. 24, 29 (Bankr. E.D. Cal. 2011). The question of standing to enforce a negotiable instrument is not whether the plaintiff is a holder or a holder in due course, but rather whether the plaintiff is "a person entitled to enforce the instrument" under the applicable state adoption of U.C.C. Article 3 provisions. *Id.* at 29–31.

In this diversity case, the law of Kansas is the choice of law under the loan documents to which the defendants are parties. Kansas has adopted Article 3 of the U.C.C. regarding negotiable instruments at K.S.A. 84-3-101, *et seq.* Under K.S.A. § 84-3-301, there are three ways in which a person may qualify as the person entitled to

11

enforce a note. One way is to be a "nonholder in possession of the [note] who has the rights of a holder." *See* K.S.A. § 84-3-301(b). This can occur if the delivery of the note constitutes a "transfer" as defined in K.S.A. § 84-3-203, because transfer of a note "vests in the transferee any right of the transferor to enforce the instrument." *See* K.S.A. § 84-3-203(b). As stated in K.S.A. § 84-3-203(a), a note is transferred "when it is delivered by a person other than its issuer for the purpose of giving to the person receiving delivery the right to enforce the instrument." The Editors of the U.C.C. have provided an example of how this might play out:

> [A]ssume that the payee of a note sells it to an assignee, intending to transfer all of the payee's rights to the note, but delivers the note to the assignee without indorsing it. The assignee will probably not qualify as a holder (because the note is still payable to the payee) but, because the transaction between the payee and the assignee qualifies as a transfer, the assignee now has all of the payee's rights to enforce the note and thereby qualifies as the person entitled to enforce it.[3]

The case at hand mirrors this example. In addition to claiming standing as a holder and holder in due course, UniCredit pled alternatively that it is "a person entitled to enforce the instrument" as an assignee. UniCredit's alternative standing is based upon the rights of Mellon, which is an assignee of all rights in the Eastman Agency's loan and security agreements as well as Eastman's guaranty. *See supra*, Sections III.A.2–3. This properly establishes UniCredit as a non-holder in possession

---

[3]*In re Jackson*, 451 B.R. at 30 (internal quotation marks omitted) (quoting Permanent Editorial Board for the Uniform Commercial Code, Draft Report of the PEB on the UCC Rules Applicable to the Assignment of Mortgage Notes and to the Ownership and Enforcement of Those Notes and the Mortgage Securing Them, 3–6 (March 29, 2011) (http://extranet.ali.org/directory/files/PEB_Report_on_Mortgage_Notes-Circulation_Draft.pdf) (footnotes omitted).

under K.S.A. § 84-3-301(b). The court finds UniCredit has standing as an entity entitled to enforce the loan at issue.

     5. Defendants Cannot Challenge Validity of Assignments

Defendants make additional attacks on UniCredit's standing by arguing that (1) the sale of loans to Mellon fails for lack of consideration, and (2) the failure of Mellon to acquire allonges duly indorsing the Notes resulted in Loan No. 5084 never becoming part of the corpus of the securitization trust. However, courts generally do not allow a third party to allege a breach of contract between two other parties within his defense. *See Livonia Property Holdings, L.L.C. v. 12840-12976 Farmington Road Holdings, L.L.C.*, 717 F. Supp. 2d 724, 735–38 (E.D. Mich. May 13, 2010) (collecting cases on courts' long-standing hesitancy to allow this attack). "[T]he validity of the assignments does not affect *whether* Borrower owes its obligations, but only to *whom* Borrower is obligated." *Id.* at 735 (emphasis in original). Although a debtor may assert defenses that render an assignment absolutely invalid (such as nonassignability of the right assigned,) it generally may not assert any ground which may render the assignment voidable merely to insure itself that it will not have to pay the same claim twice. *Id.* at 735–36.

In the case at hand, defendants do not argue that they have already paid this loan back to any party in this chain of transactions. Defendants do not argue that some other party is claiming the right to its repayment. Rather, the intermediate parties between Mellon and defendants are no longer doing business. This court is disinclined to adopt defendants' arguments against the validity of contracts to which it is not a party. As a result, UniCredit's standing remains established.

B. Motion to Dismiss Under FED. R. CIV. P. 12(b)(6)

1. Quantum Meruit Claim

In order to make out a claim for quantum meruit under Kansas law, a plaintiff must allege: (1) a benefit was conferred upon the defendant by the plaintiff; (2) there was an appreciation or knowledge of the benefit by the defendant; and (3) there was an acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without payment of its value. *T.R. Inc. of Ashland v. Brandon*, 87 P.3d 331, 336 (Kan. Ct. App. 2004) (citing *Haz-Mat Response, Inc. v. Certified Waste Servs. Ltd.*, 910 P.2d 839, 847 (Kan. 1996)).

In the complaint, UniCredit never alleges that it conferred any benefit upon the defendants. The only benefit defendants obtained was from BCC, which gave them the loan. UniCredit argues that by virtue of the similarities between Kansas and Texas quantum meruit elements, this court should adopt the reasoning of the Texas state appellate court in *McElroy v. Unifund CCR Partners*, 2008 WL 4355276 (Tex. App., 14th Dist. 2008), which allowed an assignee plaintiff to recover. As well-reasoned as that court may have been, this court declines to adopt its interpretation of quantum meruit claims when Kansas courts have yet to adopt it. Currently, Kansas law requires a plaintiff claiming quantum meruit to have conferred a benefit upon the defendant. *See T.R. Inc. of Ashland*, 87 P.3d at 336. The court dismisses UniCredit's quantum meruit claim because the Complaint does not allege any benefit conferred upon the defendants by UniCredit.

2. Breach of Implied Covenant Claim

14

The implied duty of good faith and fair dealing is part of every contract, so any violation of that duty is a breach of contract. *See Wayman v. Amoco Oil Co.*, 923 F. Supp. 1322, 1359 (D. Kan. 1996), *aff'd,* 145 F.3d 1347 (10th Cir. 1998). In order to prevail on an implied duty of good faith and fair dealing theory under Kansas law, the plaintiff must: (1) plead a cause of action for "breach of contract," not a separate cause of action for "breach of duty of good faith"; and (2) point to a term in the contract "which the defendant[ ] allegedly violated by failing to abide by the good faith spirit of that term." *See id*. (quoting *Pizza Mgmt., Inc. v. Pizza Hut, Inc.*, 737 F. Supp. 1154, 1184 (D. Kan. 1990)).

Defendants argue that UniCredit fails to identify a specific contractual provision violated by the defendants' alleged breach of the duty of good faith. However, the Loan Agreement explicitly provides that in the event of default, the Borrower shall cooperate fully with Lender and transfer or deliver to Lender the Agency Assets that form the collateral of the Loan. *See* Complaint Exh. D, ¶ 14. The complaint asserts that after their breach, defendants did not turn over commissions to UniCredit and interfered with Unicredit's possession of defendants' collateral on the loan. UniCredit has established its standing to enforce the terms of the Loan Agreement in place of the Lender. The court finds that UniCredit fully identified the contractual provision relating to defendants' breach of good faith.

3. Conversion Claim

The statute of limitations for conversion is two years. K.S.A. § 60-513(a)(2); *N. Natural Gas Co. v. Nash Oil & Gas, Inc.*, 526 F.3d 626, 630 (10th Cir. 2008). Under the

15

"discovery rule," a cause of action for conversion accrues when the "fact of injury becomes reasonably ascertainable to the injured party." *N. Natural Gas Co.*, 526 F.3d at 630 (quoting K.S.A. § 60-513(b)). A conversion may be based on the detention of possession from one who has the right to possess it. *Queen v. Lynch Jewelers, LLC*, 30 Kan. App. 2d 1026, 55 P.3d 914, 921–22 (Kan. App. 2002). One in possession of a chattel . . . who, on demand, refuses without proper qualification to surrender it to another entitled to its immediate possession is subject to liability for conversion. *Id.*

Here, defendants argue that the statute of limitations began in September 2009, when UniCredit sent a letter to defendants referencing their breach of the security agreement. Defendants argue that this is when the conversion became "reasonably ascertainable" to UniCredit under Kansas law. UniCredit argues that the conversion was not reasonably ascertainable until it sent a letter demanding the collateral in May 2012.

The court agrees with UniCredit, because the loan documents contemplate several steps before the Lender may possess the collateral. In the Loan Agreement, the defendants agreed to grant, convey and assign to the Lender all right, title and interest in the Agency Assets. However, the Loan Agreement states that actual possession of the Agency Assets "is deemed to occur when Lender or its agent notifies Borrower of default, Borrower fails to cure such default within the time allowed hereunder, and demands that the Agency Assets be transferred and paid directly to Lender." Complaint Exh. D, ¶ 12(c).

16

UniCredit's letter in September 2009 discussed the defendants' default on the loans for failure to pay and invited defendants to set up new terms for continuing the loan. *See* Memorandum in Support of Motion to Dismiss Exh. E. This was just the first step contemplated by the Loan Agreement: notifying the Borrower of default. UniCredit did not make its demand upon the collateral to the loan until May 2012. Until this demand letter, under the terms of the Loan Agreement, the conversion was not "reasonably ascertainable" by UniCredit. *See N. Natural Gas Co.*, 526 F.3d at 630. The court finds that the conversion claim was brought within the two-year statute of limitations.

**IV. Conclusions**

The court finds that UniCredit has sufficiently established a chain of transactions that ultimately assigned it the rights necessary for standing in this case. The court finds that none of the defects alleged by defendants negate UniCredit's standing. The court dismisses UniCredit's quantum meruit claim for failing to allege that it has conferred a benefit on defendants. The court does not dismiss UniCredit's breach of implied covenant and conversion claims.

IT IS THEREFORE ORDERED this 18th day of January, 2012, that the defendants' Motion to Dismiss (Dkt. 16) is granted in part and denied in part, as set forth herein.

s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE
